Oh is everybody here? Now that everybody's here on this case we will first hear from Chad Schultz for the SkyWest Airlines. Thank you. May it please the court. My name is Chad Schultz and I represent SkyWest Airlines. This is a sexual harassment case that was tried in November of 2024. There was a jury verdict for the defendant on retaliation. There was a pretrial ruling in this case that there would be no back pay damages so the verdict on compensatory damages was the issue before the jury. We have three issues that we would like to raise on this appeal with the court. The first one is mitigation of non-economic compensatory damages. The court refused to instruct the jury on mitigation of damages and we request a new trial on damages as a result. The second issue is one on punitive damages. We believe were not appropriate for this case and should be stricken. And the third issue is a hearsay evidence issue related to text messages that frankly tainted the verdict and we request a new trial on that basis. The first one I would like to address is mitigation of non-economic damages. That relates to section 42 U.S.C. section 1981A.B.3 which generally is the 1991 changes to the Civil Rights Act which allowed for compensatory and punitive damages. Judge Fitzwater ruled that on pretrial that there would be no back pay damages so compensatory damages were the issue. The jury was to decide compensatory damages and the defense requested that they get a jury instruction on mitigation of damages. The court refused that which we believe is an error of law. We recognize that the standard is abuse of discretion but this is an error of law so it would be a de novo review. The jury did not evaluate or didn't have an opportunity to evaluate avoidable emotional distress harm. The record showed first that the plaintiff stopped psychiatric treatment after only one visit. Secondly, that she did not fill or continue to take medication that had been prescribed. Third, she did not pursue any treatment with psychologists, psychiatrists or any other medical providers. And finally, at trial the plaintiff had two witnesses that were medical related and both of those witnesses acknowledged that if she had sought treatment and she had done what the doctors had requested it would have helped. So we believe that it is undisputed that emotional distress harm could have been avoided had she acted reasonably. We requested the standard instruction on common law mitigation and that is just related to avoidable consequences. This is an issue of first impression for this court and there are actually two district court opinions, this one and an earlier one that are exactly on the same point but came down a different way. Yes sir. You list numerous cases on this issue but which is your best case preferably most on point. The best case on this is the EEOC versus, I'm sorry sir. Emotional distress as a non-economic loss for purposes of compensatory damages. Yes sir. Under the 1991 act the congress added compensatory and punitive damages to the civil rights act of 1964 and in there they describe compensatory damages as emotional, pain, suffering, mental anguish, loss of enjoyment of life. The typical things that you see for compensatory damages. Now where was that? That was in the 1991 changes to the civil rights act of 1964 but this was in 1991. Yes sir. That's where you could get compensatory damages and that is related to 42 USC section 1981 AB3. Avoidable consequences. Specifically what do you say is in that statute? That you could get compensatory damages for employment discrimination claims. But you're concerned, you're talking now some duty to mitigate damages for emotional distress. I'm talking about an affirmative defense on behalf of the defense where they can challenge whether the plaintiff acted reasonably in avoiding those consequences of emotional distress. So you're not talking about mitigation of damages? It is mitigation of Where is that in the statute? That is not in the statute which is the point. It does not because that is common law and doesn't need to be addressed in the statute and the statute is silent on that which there's case law that would support that there's a presumption that when congress enacts a law unless it says the common law does not apply to this then the presumption is that it does apply and that would be found in the Astoria. The statute does talk about mitigation of damages with regard to back pay. In 1964 that is correct. In 1964 when they enacted the law it only related you could only get back pay damages. You could not get compensatory or punitives and back pay damages were a statutory equitable relief created by that statute. So there they needed to set out what the standard was. Where in 1991 when they established and added compensatory damages for employment discrimination claims there was already a common law damages mitigation on the books that had it relied relates to all compensatory. So you're surprised that they said nothing about it because it existed under common law and not that they didn't say anything about it because they didn't want to require. Exactly exactly and that's exactly what the case EEOC versus SDI and that is a case that also occurred in the same district and in their very similar case and the court concluded there that avoidable consequences are it is a background common law doctrine applied to compensatory damages universally. That's the application. So the fact that Congress didn't say anything in 1991 about the need for or that mitigation damages it's already listed and for example to give you an example of other situations like that for example in 1998 the Supreme Court adopted Farragher and Ellerith cases which basically said that someone who is claiming an environment sexual harassment or any other kind of harassment has a duty to step forward and report that harassment and that that could be an affirmative defense for the employer if the alleged victim did not bring that forward to the employer. Now that doesn't say anything in the 1991 act about that but that's something that is a common law issue that the Supreme Court adopted or confirmed in 1998 and also if you look at and that's basically avoidable consequence what the court is saying is you the plaintiff you need to avoid consequences of harm if possible and there for example you need to report that and then in the Kolstad case for example which we know is is the Supreme Court case that relates very significantly to punitive damages the court said that if the employer can assert that they acted in good faith basically that then punitive damages would not be appropriate. Again same thing it's a situation where Congress did not specifically say that in the statute but it's been something that's been created and adopted from common law and then also in the after acquired evidence doctrine same thing it wasn't mentioned in the 1991 act but courts have consistently applied common law. The defense was irreparably prejudiced by the fact that the judge did not allow this mitigation of damage claim because the jury had no legal way to account financially for the plaintiff's failure to avoid compensatory damages the emotional distress etc. So the remedy we seek on that is a new trial on damages with the mitigation instruction being given to the judge given to the jury. The mitigation defense is just common law it's very commonly used in all courts but the one of the questions is is it been used in Texas and there are a number of cases that we cited in our brief where it has been used and that's on page 35 and 36 of our brief. Footnote number two Congress was silent but Congress's silence does not mean that it doesn't apply what it means is it's already been addressed and no need for Congress to do that. Congress has understood the legislate against the background of common law principles and that's the Astoria case and that's 501 US 104 and that's a 1991 case. The second issue that we would like to address is punitive damages. In this case we believe that the record was insufficient to support punitive damages. Liability for harassment and punitive damages are not the same thing. Punitive damages require proof that a managerial actor acted in the face of perceived risk and the conduct violated federal law and the employer did not act with good faith compliance efforts. In this case the record we believe is clear that the defendant did have a policy against discrimination and harassment. It acted on that policy. It investigated the claim. It allowed the plaintiff to be on a paid leave while they investigated. They trained employees. They did all those things which would show that it was not a sham. In fact they followed their policy. Now there can be criticism of any investigation but that's negligence. That's reckless indifference to the rights of another which is what the Kolstad case required. That's where the Supreme Court concluded that there's a very high burden associated with punitive damages. Now in this case you have to generally show what particular managerial employees were willfully indifferent to the rights. And there are three that we're talking about in this case. There's Mr. Hanson. Now with Mr. Hanson he was the supervisor of the mechanics. He was not the supervisor of the plaintiff. There's no evidence on the record that he had received the Title VII training or that he was subjectively aware of the law. The second person is Mr. Widmer. Mr. Widmer received a vague initial report. It related to mechanics, not anyone under his supervision. And his testimony is that he was told not to escalate this by the plaintiff. He did report to the company immediately once he received the written complaint from the plaintiff. And the only evidence you could possibly surmise against him is that he was passively inactive. He should have reported what he learned in September, the first initial report, but he and she was the investigator. Now it's almost impossible to do an investigation without there being some criticism, but what you can show in the record is that the investigation was done and at most if there were things missed in the investigation it was certainly not as a result of willful indifference to anyone's rights. Remember too, this was an airline during COVID, so the HR department was completely inundated with other issues about keeping... Well, let's talk about Davis. Didn't she kind of randomly decide which witnesses she was going to interview as part of her investigation? I think in an investigation it's always some subjective on behalf of the investigator as to who they're going to interview. Now again, even if we assume that she was negligent in her performance on the investigation, it does not show that she acted with reckless indifference. And remember too that the court, the jury decided there was no retaliation because what the EEOC and a plaintiff tried to establish in the trial was the retaliation they did. What the EEOC was trying to establish was it took them so long to do this investigation that that was something that they should be punished for, the punitive part. But the jury came back with no retaliation. So we're left with just those three actors in the things that I mentioned and none of those rise to reckless indifference. So we ask that the matter be reversed and remanded with directions to enter judgment for Sky West on the punitive damages issue. The final one that I'd like to talk to is about hearsay. And this is obviously an out-of-court statement that was used to prove the truth of the matter asserted. So Bud testifies, the plaintiff testifies that certain statements were made to her. There's no corroboration for those statements. Then she comes in with text messages to the husband and to friends and a sister-in-law. And we said those are out-of-court statements used to prove that statements were made to her. She's using that to say I'm telling the truth when I tell you this is what so-and-so said to me. And so I objected to that during the trial and the judge overruled that. He said he asked the EEOC are these being used for the truth of the matter asserted. They said no they're not. And so the judge overruled that and then he did give a supporting explanatory statement to the jury at that time about the use of the text messages. The problem is obviously we disagree with that ruling but we understand the deference given trial judges on issues like that. The problem is where the EEOC stood up in their closing argument and said this wasn't a lie. Ms. Bud was texting. You will get a copy of those texts when you deliberate and I encourage you to read all of them very closely. That's the issue. You've said this in your brief and you have time for rebuttal. Thank you. Okay and we'll now hear from the appellee. I'm not sure I can say your last name. I think I can say James. I'm not sure I can say the last name. But I'll let you say it. Good morning, your honors. My name is Jim Driscoll McCachren on behalf of the EEOC and with me at the council's table is Edith Thomas on behalf of plaintiff intervener Sarah Bud. Like Sky West, we'll start with the mitigation instruction and I think it really is important to focus in on they are asking for a new mitigation defense. You've heard them concede again here that the text of the statute is silenced with regard to whether there's a and courts typically don't provide absent language to a statute. There's a limited circumstance of course when the non-derogation canon articulated in Pasquantino, Astorio and other cases applies. But to invoke that canon, Sky West had to identify a common law rule that was well settled and established at the time the 1991 act passed. It had to be so well established that courts can infer that congress knew about the common law duty and wanted it to apply to the subject of the statute. Sky West didn't meet that burden here. Most of the cases at Sky West sides either postdate the 1991 act, don't specifically address emotional distress damages, or both. You heard council speak about general mitigation cases in the avoidable consequences doctrine. But that is too general a standard. The non-derogation canon requires specificity. You see that in cases like Hanford and the Virgin Islands case out of the first circuit. And it's particularly important here because mitigation emotional distress damages raises unique concerns. The requirements that Sky West would impose here would affect individuals choices about taking medication that affects how they interact with the world, their sense of identity, core concerns that aren't present for other kinds of damages. And the scholarship first cited by Sky West and everything pointed on ours also acknowledges that this was not a well-settled rule even after the 1991 act. And that 1991 date is important because Pasquantino makes clear that you cannot rely on postdated cases to infer an earlier well-settled rule because congress could not rely on those later cases. So Sky West had an obligation in invoking this canon to identify pre-1991 cases that established a clear rule. It's not enough that that rule is unclear. It's not enough that cases are pointed both ways. It has to be so well established. And that's not a burden that met here. And you heard council say here again, as they did in the reply brief, that this is a case of first impression in the circuit. And I would submit that if the defense was so well established in 1991 that congress could have inferred the presence of the rule. Defense attorneys likely would have too. And we would have seen a number of cases invoking the doctrine of mitigating emotional distress damages. And we haven't. In fact, cases in this circuit have routinely reviewed emotional distress damages, some of which involved medical treatment in other cases or seeking psychiatric care, not in the context of mitigation. So for example, in Migas, this court applied the doctrine of mitigating emotional distress damages, reviewed the size of the emotional deaths. And there's a dissent in that case where the dissent pointed out that the plaintiff had testified that they had not sought a psychological counseling. The dissent did not raise that in the context of a failure to mitigate defense. It was arguing that the emotional distress damages should be lower. And that goes to something else. The council said they did not have an opportunity to elicit that testimony at trial. And this court does consider whether or not someone seeks care for their psychological injuries in assessing the size of the emotional distress damages. It's routine that damages awards are larger when their care is so severe that it does require treatment. You can see that, for example, in this court's case in Salinas, where the court considered how much the plaintiff had spent on treating their emotional distress. You can also see it in this case's court in Forsett, where there are two plaintiffs who described similar situations of anxiety and depression, one of whom sought psychological care and the other didn't. The one who sought psychological care got $100,000 in emotional distress damages. The one who did not get $75,000 in emotional distress damages. But there's no discussion in that case about whether or not there was any obligation for either to mitigate those emotional distress damages. If the court doesn't have any questions on that issue, I'll turn to the punitive damages issue. On punitive damages, it's important to keep in mind the standard of review here. The district court denied their judgment for a matter of law. So this court's review is especially deferential. Skywest has to show that no reasonable jury could reach a contrary conclusion than the one they propose. And the evidence simply doesn't support that. Punitive damages have two parts. First, we have to establish a basis for punitive damages liability, and Skywest has to establish their good faith defense. On the first, we only need to identify one manager who acted with the reckless indifference to the federally protected rights in this spot. There was evidence that the jury heard that three different managers violated that standard. But this court can start and end its analysis with Mr. Hanson. As you heard again today, the only dispute Skywest raises on whether this court can rely on Hanson as a basis for punitive damages liability is that there was not specific evidence that he received training on Skywest's anti-harassment policy. But the jury heard evidence from this day that Skywest trains its employees on the anti-harassment policy when they're hired, again when they're promoted to a leadership position, and nearly after that. And Mr. Whitmer corroborated that, saying that he was trained on the harassment policy when he was hired, and again when he was promoted to manager. The jury could infer from those facts that Hanson, as a manager, would have received the same testimony. You can see that in this court's case in EEOC versus service text. The Skywest hasn't suggested why the jury could not make that reasonable inference, and as a result, hasn't shown a reason to displace that carefully considered verdict on punitive damages. If the court would like to hear about Whitmer or Day as a basis of punitive damages liability, I can discuss those as well. But again, I think Hanson is sufficient. In this case, the jury awarded $2 million in punitive damages, and then the district court reduced that to $130,000. That's correct. In line with the statutory cap, it's under 1981A. And there's been no challenge to that. My only point is we're not talking about some multimillion-dollar award of punitive damages. That's absolutely right, Your Honor. This court doesn't have to reach the good faith defense for punitive damages, because Skywest didn't preserve the issue below. We laid that on our brief. But even if the court chooses to address that issue, it's a very high bar for Skywest. It has to, again, show that no reasonable jury could do anything but conclude that Skywest proved that they acted in good faith. And they simply haven't met that standard here. When assessing their good faith, you have to look at the whole picture, not just the investigation, which we will get to, but the responses to this egregious harassment that the jury heard and found occurred, starting with Ms. Budd's testimony that she complained to Dustin Widmer that she was being subjected to unwelcome sexual comments as early as September 4th. Skywest would like you to credit Mr. Widmer's testimony that that complaint was more vague, but the jury did not have to credit Mr. Widmer, and it can credit Ms. Budd. She said that she told him there were unwelcome sexual comments. He did nothing. In fact, he did worse than nothing. He told her he wasn't going to do anything, because if he did anything, it would put a target on her back. Then Skywest does nothing about the harassment that Ms. Budd testified was occurring on a daily basis in the most egregious forms. We've laid out details of that in our brief. I won't go into them here. When they finally do respond in December, it's after another egregious act of harassment, referred to as the candy jar incident. That incident involved, as Ms. Budd said, hearing the word rape more than 40 times in the course of a single day. The jury saw a picture of the doll with a note that said, Carlos raped me this morning in front of three people. The jury heard evidence that this egregious comment was going on all day, and that was corroborated in the witness interviews in Skywest's investigation. That investigation, by the way, was supposed to be into all of the harassments that Sarah Budd alleged. You can look at her complaints on December 14th and December 16th. They provide very detailed lists. Then when she met with Ms. Day, she identified who participated in the most of the harassers that Ms. Budd interviewed. For example, even on the candy jar incident, Ms. Budd told Ms. Day that Jay had been the one to say, two of you grab its arms or one of you grab its legs. But there's no evidence in the record that Day attempted to interview Jay or disciplined Jay. Then in those interviews, two other witnesses corroborated that Jim Lusk was an employee at Skywest who was making sexual comments. But again, there's no evidence in the record that Ms. Day attempted to interview Jim Lusk or discipline Jim Lusk. Instead, as you mentioned earlier, Ms. Day said that she started by interviewing a couple of employees, then chose who to interview randomly. That is not a sufficient basis to compel a conclusion of good faith. And that's particularly so when you look at then the discipline that was issued. There was not a single piece of discipline that was issued for anything other than that one day's worth of harassment, possibly because they didn't interview many of the people that could have been involved. And the level of that discipline is critically lacking. Whitmer testified that the level one discipline that was issued to two of the three employees was the same that a manager could give without any interactions with human resources if the employee had been tardy or no-showed. That simply doesn't match the level of severity, even if we ignore the months of harassment and look only at the candy jar incident, rape 40 times a day, pictures showing egregious comments, testimony that that went on for hours. That's not the same as a tardy. And a jury could find that you are not attempting to comply with Title VII in good faith by letting that kind of conduct go with that sort of minimal discipline. The other thing SkyWest said it would do was to offer remedial training because Ms. Day said her only other option was to blatantly fire everyone in the maintenance department. That training didn't occur for three years. We absolutely acknowledge that the pandemic occurred during that time, but the jury heard testimony that SkyWest offered computer-based training, and they heard from Nikki Mitchell that trainings were going on in other locations, just not at Dallas. The jury could consider that evidence in finding that SkyWest didn't act in good faith. Unless there are questions on the punitive damage issue, I'll turn to the hearsay issue. So on hearsay, there's several steps that we need to go through because they are seeking a new trial. SkyWest asserts that the text messages exhibits were admitted for their truth. But isn't this showing that she just sent this out at the time? Yes, so she testified. I mean, so she did testify about it. So I guess I'm struggling a little bit about why they think that's a hearsay. I mean, it is a hearsay, but why it's a problematic hearsay? If it were used for the truth of the matter asserted, it could be a hearsay statement, and you're exactly right that it would then fall under the present sense impression because Ms. Budd testified that she sent the text in instant real time, and with regard to the prostitution text, the only text that SkyWest discusses in any detail, she said she sent that shortly after it happened. But I would take a step back first. We contend that these text message exhibits were not admitted for their truth. They were admitted as the district court said, as he allowed the...  Right. It's that she was complaining that it was the subjective element. And you can see that in the structure of the testimony. For example, again, I'm going to focus on the prostitution text because that's the only one SkyWest is focused on. You're saying present sense impression comes in anyway? Absolutely. Text messages. Yeah. And so the series of text messages, because I think for purposes of space, we all accepted it. But that text message took place between 10.59 and 11.08 AM in the morning and included her starting with, I'm sorry, baby. I can't do this. I'm trying not to complain. I do McDonald's over this any day. I'm so sorry. I'm not built for this. I hate them. I'm happy to work. I'm happy to do the work. I hate these people, if you can call them that. Then her husband, Michael, asked her to call him. And she says, she can't. I'm receiving parts. Greg is apparently where they're going to sell me for prostitution. So that series of text messages is clearly evidence that she was upset and complaining about the work environment that she was enduring. The judge then admitted it with an explicit limiting instruction, telling the jury, don't consider this for any of the truth of the matter asserted. You should consider this only that she was complaining. Juries are, of course, presumed to follow that limiting instruction. But then only if you get past the non-truth purpose for which it was admitted, limiting instruction, then you still have to go through the harmless error analysis. And that's where the president's sentence impression that you discussed comes in, because if a statement is admissible on any other ground, the error is harmless. It's also where the fact that the exhibit is cumulative also comes in. Because to show harmless error, they have to show that it would affect the outcome of the trial. This is cumulative on really two different levels. First, and I think most significantly, the evidence of the harassment there was extensive. They say that it was only Ms. Budd's testimony. I'm going to dispute that in just a second. But she testified in detail over pages and pages of trial testimony about the awful things she suffered. And the jury could credit that. In Harris, this court considered an expert who testified impermissibly that in the expert's opinion, the employer had discriminated and retaliated against the plaintiff. This court held that that was error. However, it was harmless because there was sufficient other evidence in the record to support the retaliation. And they considered whether the declarant was subject to cross-examination. Here, Ms. Budd was subject to significant cross-examination. And there was plenty of other evidence in the record. Not just Ms. Budd's testimony in court, but the parallels that you could draw between, for example, Mr. Avalo testifying that he heard Zach say that, and I'm going to paraphrase here, that he wanted to have sex with Ms. Budd. That parallels Ms. Budd testifying that Zach had joked about a sexual position with her. Avalo testified that he had seen someone looking at a picture of a naked woman in the workplace, which corroborates Ms. Budd saying that she had seen people looking at pictures of naked women in the workplace. But there's also corroborating testimony on the prostitution text itself. As we had already discussed, Ms. Budd had already testified about the comment that happened. Later in the trial, her husband would testify that she told him about that comment without objection. In Exhibits 3 and 17 that were exhibited without objection, that's the SkyWest investigative file and Ms. Budd's December 14th complaint, she lists that comment as one of the comments that was made and that she was complaining to SkyWest about. If that text message were admitted for its truth, which we strongly contend that it was not, if we ignore the limiting instruction, nor that it could come in as a present sense impression, there's still plenty of other evidence on that specific report. And really the focus in the analysis is, is there sufficient evidence for the jury to have found a hostile work environment here? And if you remove that single text message, there's no reason to think the jury would have reached a different result. Okay, any questions? Okay, thank you. We appreciate your argument, and we'll now hear the rebuttal. It's a short rebuttal. Thank you. On the mitigation issue again, it's applied to damages generally. It applies to all damages, including tort damages, which is very similar to the compensatory damages here. The treatises support the fact that consequential, that one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort. The duty to mitigate is clearly established in common law, and the court's refusal to so instruct in this case should result in a new trial on damages. As to the punitive damages, we support the fact that it's still at best is evidence that there was negligence, not reckless indifference to the rights of anyone, and that the company did act in good faith, had a policy, did an investigation, and did the things that the court requires. As to hearsay, if we go and we consider this, imagine if one of the defense witnesses, when being confronted with a statement that the plaintiff is claiming was said, then sent a text message to their spouse saying, you won't believe what I'm being accused of. I didn't say that. Clearly, the court would not have allowed that text message in, because it's hearsay. And in this case, this is the same thing. Wouldn't it be relevant if she made allegations that she was sexually harassed? Wouldn't it be relevant for the defense to ask, well, did you complain to anybody or did you tell anybody about this harassment? Wouldn't that be a relevant question? Of course. So if it's relevant, whether or not she made a complaint, why isn't the text message relevant as evidence that she complained? Well, what they tried to use it for is to say, this is exactly what was said. This harassing complaint was said, because I've got a swearing contest. I say it was said. They say it wasn't. As proof of it, I've got this text message. And that's where we're saying that once the EEOC got up and told the jury. But that text message is just proof that she complained. But I'm saying, isn't that relevant proof? Hearsay proof. It's hearsay proof. And they didn't use it so that she complained. So if you ask her, did you complain to anyone, and the answer is no, would you be entitled to get that answer? Would I be entitled to that answer? As a defense, then, would you want to know? If she'd never complained to anybody, wouldn't you want the jury to know that? Absolutely. That's relevant. But I wouldn't use it through a hearsay of a text message. Well, there is no hearsay if she didn't complain. The answer is just no, I didn't tell anybody. All I'm saying is I don't know how you can get into that area. Talking about whether or not somebody complained without asking the question, I think is highly relevant. I think it would be asked by any defendant in any case. So all that's happening to you, did you tell anybody? If the answer is no, as a defendant, that helps you. The answer is yes, it hurts you. But it's certainly relevant. Hearsay or whatever we call it, there's got to be some exception that allows that that kind of information is admissible. Depends on what it's used for. And in this case, the EEOC made it clear in their closing argument that they were using it for the proof of the truth of matter asserted. And the matter asserted was, this statement was made, it's a violation of the agreement. Okay, thank you. We appreciate both sides' arguments. We're going to take a very short break before we have one more argument coming up. We'll take about a five-minute break. Okay, we'll do a 10-minute break and then get back.